UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
EMILY M. ORTIZ,

                Plaintiff,

                                  **MEMORANDUM AND ORDER**

     - against -

                                   11 Civ. 3323 (NRB)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.
------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


     Plaintiff Emily Ortiz brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") to deny her application for Supplemental Security Income ("SSI") benefits. The Commissioner has moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), and plaintiff has submitted a brief in opposition to this motion. For the reasons set forth below, the Commissioner's motion is granted.

**BACKGROUND**[1]

     Plaintiff applied for SSI benefits on April 27, 2006, asserting that she was disabled due to vision problems,

---

[1] All facts are drawn from the administrative record filed by the Commissioner as part of his answer ("Tr.").

high cholesterol, and acid reflux. (Tr. 63.) Her application was administratively denied first on August 9, 2006, and again upon reconsideration on October 19, 2006. (Tr. 60-63, 67-69.) Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on July 24, 2008, before ALJ Yvonne K. Stam. (Tr. 70-72, 31-51.) In a December 9, 2008 decision, the ALJ found that plaintiff was not disabled and thus not eligible for SSI benefits. (Tr. 25-30.) Plaintiff appealed the ALJ's decision, and, on April 6, 2009, the Social Security Appeals Council denied plaintiff's request for review, rendering the Commissioner's decision final. (Tr. 14-17.) After receiving an extension of time in which to file a civil suit, plaintiff commenced this action on May 4, 2011.

## I.   Non-Medical History

Plaintiff was born on November 15, 1970. (Tr. 97.) She attended school in New York City, enrolling in special education classes at the age of eleven and eventually completing the seventh grade. (Tr. 7, 9, 37-38.) At that time, however, she decided to stay at home with her family full-time. (Tr. 39.) She has worked briefly as a companion to the elderly and mentally handicapped, but she has not had gainful employment since 1998. (Tr. 35-37, 107.) She is

currently unmarried and lives with two of her adult children in Fort Wayne, Indiana. (Tr. 98.)

## II.  **Medical History**

### A.  **Medical History Before April 2006**

Plaintiff made several visits to the Parkview Hospital and Health Clinic ("Parkview") in Indiana prior to her application for SSI benefits. On December 22, 2002, plaintiff arrived at Parkview's emergency room complaining of "10 out of 10 pain everywhere." (Tr. 222.) However, the examining physician, Dr. Thomas Dykstra, found her claims "hard to fathom," as she was unable to pinpoint the pain and remained comfortable and joking when examined. (Tr. 223.) He consequently referred her to outpatient care for ongoing general care. (Tr. 222-24.)

In July and December of 2003, plaintiff returned to the emergency room to complain of toothache and skin irritation. She was prescribed medication and dismissed in stable condition. (Tr. 218-22.)

On March 18, 2005, plaintiff again visited Parkview, now complaining of slurred speech, memory loss, and disorientation. (Tr. 150.) The clinic administered a brain MRI, which returned normal results. (Tr. 150.)

Plaintiff was next seen by Fort Wayne Eye Associates in September of 2005, where she was assessed with amblyopia, or "lazy eye." (Tr. 154.)

On March 29, 2006, plaintiff saw Dr. Michael Mohrman of Brooklyn Medical Associates to address her cholesterol levels, epigastric pain, and skin problems. (Tr. 156.) Dr. Mohrman noted that she had an unusual skin eruption on the face, mild acne of the back, and a history of epigastric pain relieved by medication. (Tr. 156.) He also ordered a lipid profile screening, which revealed borderline high cholesterol levels. (Tr. 157.)

### B.   Medical Evidence Between April 2006 and December 2008

#### 1.   Dr. Venkata Kancherla

In May of 2006, plaintiff saw Dr. Venkata Kancherla in Fort Wayne, Indiana, to complain of a rash, acne, swallowing problems, gastroesophagal reflux disease ("GERD"), and high cholesterol. (Tr. 170.) Dr. Kancherla prescribed medication for plaintiff's GERD and cholesterol, additionally diagnosing her with acne and dysphagia, or difficulty swallowing (Tr. 171, 169.)

#### 2.   Allen County Retinal Surgeons

Plaintiff visited Allen County Retinal Surgeons in Fort Wayne, Indiana, in May of both 2006 and 2007. On May

8, 2006, plaintiff visited Dr. Michael Farber, complaining of increased photopsias and new floaters impacting her vision. (Tr. 161-62.) Dr. Farber found atrophying of both retinas and pigmentary changes in the area around the optic nerve head associated with myopia. (Tr. 161.) In the left eye, which plaintiff asserted had always suffered from limited vision, Dr. Farber also found amblyopia and detachment of the vitreous from the retina. (Tr. 161.) He noted that "good eye protection for the right eye is essential" and recommended that plaintiff seek immediate medical attention should her conditions worsen. (Tr. 161.) When she visited Allen County Retinal Surgeons again on May 29, 2007, however, the examining physician found no new retinal breaks and prescribed only artificial tears. (Tr. 200.)

### 3.   Dr. Earl Braunlin

Shortly after she applied for SSI benefits and at the request of the Commissioner, on July 24, 2006, plaintiff was examined by opthalmologist Dr. Earl Braunlin. (Tr. 184.) Dr. Braunlin determined that her vision was 20/30+3 in her right eye and 20/400 in her left eye, surmising that her vision had worsened due to the left eye's amblyopia. (Tr. 186.) He did not recommend corrective surgery and concluded that plaintiff would be able to work in a field

that did not require her to have 20/20 vision in both eyes. (Tr. 186.)

### 4. State Agency Physicians

Plaintiff's condition was next assessed, on the basis of the medical evidence on record, by physicians working for the Disability Determination Bureau. On August 9, 2006, Dr. M. Ruiz determined that plaintiff's vision was limited but did not meet or equal the requirements of any impairment listed in the Social Security Act as entitling a claimant to SSI benefits. (Tr. 191.) Dr. D. Neal affirmed this assessment on October 12, 2006, noting that plaintiff's condition had not worsened since Dr. Ruiz's evaluation. (Tr. 192.)

### 5. Lutheran Hospital of Indiana

Plaintiff visited the emergency room at Lutheran Hospital of Indiana ("Lutheran") on April 17, 2007 to complain of chest pain. (Tr. 197.) The examining physician found her "very well[,] appearing in no acute distress," and at low risk for cardiac disease. (Tr. 197.) A chest x-ray showed no active disease, with clear lungs and pleural spaces. (Tr. 199.) Though plaintiff claimed a history of rheumatoid arthritis ("RA"), the physician also noted that she retained full range of motion and that her extremities worked fine. (Tr. 197.)

Plaintiff returned to Lutheran on May 23, 2007, to complain of ankle discoloration. (Tr. 195.) The attending physician found slight hyperpigmentation and callousing of the skin tissue but no infection or malignancy, and he recommended plaintiff use over-the-counter lotions and a pumice stone. (Tr. 195.)

### 6.   Boriken Neighborhood Health Center

On April 27, 2007, plaintiff walked into New York City's Boriken Neighborhood Health Center to complain of a body rash and general pain. (Tr. 193.) While the report indicates that plaintiff was sent for laboratory tests, the examining physician recorded no findings or diagnoses. (Tr. 194.)

### 7.   Return to Parkview

Plaintiff visited Parkview's emergency room on May 23, 2007, claiming that her arthritis was acting up and not responding as well to over-the-counter products as it normally did. (Tr. 216.) She reported pain with rotation of the upper extremities at the elbow and wrist and some discomfort in the hips with flexion, but she showed no gross swelling or deformity. (Tr. 217.) The examining physician prescribed an eight-day taper of Prednisone and referred plaintiff to a family doctor. (Tr. 217.)

On April 23, 2008, plaintiff returned to the emergency room to complain of chest pain. (Tr. 214.) The examining physician reported that plaintiff's EKG and cardiac profile were "entirely normal." (Tr. 214; see also Tr. 271.) She was given medication for pleuritic chest pain and, having achieved "100% resolution of her symptoms," was released in good condition. (Tr. 214.)

Shortly thereafter, on April 25, 2008, plaintiff underwent a series of tests that revealed a healthy spleen and mild enlargement of the thyroid. (Tr. 225-27.)

### 8.   Matthew 25 Clinic

Plaintiff was treated at the Matthew 25 Clinic ("Matthew 25") in Fort Wayne, Indiana, from June 2007 through April 2008, during which time she listed the clinic as her regular care provider. (Tr. 214.) On June 4, 2007, she reported arthritis, difficulty swallowing, jaw pain, and acne. (Tr. 213.) The examining physician found plaintiff's ear, nose, throat, chest, and extremities normal and referred her to dental and dermatological providers. (Tr. 213.)

On June 29, 2007, plaintiff returned to Matthew 25 and complained again of joint pain and acne. (Tr. 212.) The examining physician noted that plaintiff could not locate the joints involved but would only state that she hurt in

her "arms/legs/all over." (Tr. 212.) The physician accordingly referred her to only a dermatology clinic and indicated that her RA was questionable. (Tr. 212.)

On March 18, 2008, plaintiff visited Matthew 25 once more to discuss test results and to complain of extreme pain migrating around her body, though she reported feeling no pain at the time of the visit. (Tr. 206-07.) The examining physician found all functioning normal and recommended a follow-up on labs in three weeks. (Tr. 207.) Lab results dated March 21, 2008 indicate vitamin D deficiency and hypokalemia, or low blood potassium. (Tr. 205.)

Plaintiff similarly reported aches and pains all over her body to the clinic on April 10, 2008, but she was again unable to specifically locate the pain. (Tr. 203.) The examining physician doubted plaintiff had RA but nevertheless suggested a consult with a rheumatologist as well as a lupus panel. (Tr. 204.) The record, however, does not indicate that plaintiff ever attended such a consultation.

### C.   Medical Evidence After the ALJ's Decision

A medical order for urinalysis at Matthew 25 dated June 9, 2009, after the ALJ's decision, lists as plaintiff's diagnoses vitamin D deficiency, hypokalemia,

GERD, and fibromyalgia, a disorder characterized by chronic widespread pain and tenderness in the joints and soft tissues. (Tr. 286.)

### III. **ALJ Hearing**

At the hearing on July 24, 2008, the ALJ first questioned plaintiff about her past inability to hold a full-time job. (Tr. 34.) Rather than cite her disability, plaintiff named as reasons for her unemployment her lack of education and intolerance for both other people and following orders. (Tr. 34.) Plaintiff explained that in 1998 she had worked for two months as a companion to the elderly and in 2003 had volunteered for one month as a companion to the mentally handicapped but that she had been dismissed from both positions for failing to fulfill her job requirements. (Tr. 35-37.) The ALJ then inquired into plaintiff's lack of education and asked whether plaintiff could read such materials as the directions on a box of macaroni and cheese. Plaintiff responded that she could read them, "but not with [her] eyes being the way [they are]" because she "can't read little small print." (Tr. 39.)

After asking plaintiff to recount the findings of her retinal surgeons, the ALJ asked whether plaintiff's visual impairment caused problems beyond an inability to read

small print. (Tr. 39.) Plaintiff replied that she feels pain in her eyes once in a while and that she has been told not to strain her eyes, which necessitates limited use of computers and a lot of eye rest. (Tr. 40.)

Next, the ALJ asked plaintiff whether she had any conditions beyond her mental and visual limitations that would interfere with her ability to work. (Tr. 40.) She cited the "pain that I incur every day of my life" "from head to toe." (Tr. 40-41.) When asked to locate the pain, she stated that she felt it in her arms and legs as well as in her stomach; when asked to further pinpoint the pain in her arms, she reported feeling it "generally all over." (Tr. 42.) She described the pain as "knife-stabbing" and constant, equivalent to ten out of ten on a pain scale, but reduceable to a five with medication. (Tr. 42-43.) Upon further inquiry by the ALJ into other possible conditions constraining her ability to hold a job, plaintiff listed lupus, fatigue, "ulcers all over [her] body," and potential heart complications. (Tr. 43-44.)

The ALJ also asked about plaintiff's daily routine. (Tr. 44.) She reported that after waking up and seeing her two boys off to school, she would watch about four hours of television before returning to bed to nap and rest until the evening. (Tr. 45.) She stated that she does very little

housework as she is unable to scrub or push anything without going into "extreme pain mode," though neighbors take her shopping in the evening. (Tr. 45-46.) The ALJ then questioned plaintiff about her functional limitations. She replied that she could sit for no more than twenty minutes at a time, stand for no more than ten minutes at a time, walk no more than a block, and lift no more than ten pounds without "[s]evere pain." (Tr. 46.) She further noted that doctors recommend she sleep at least eight to twelve hours a day and that she is sensitive to sun, bright, and dim light. (Tr. 47.)

Finally, the ALJ questioned vocational expert Joseph Thompson as to the available work for an individual with no fine visual skills who requires eye protection and a safe work environment. (Tr. 48.) Thompson replied that, given a medium unskilled occupational base, there exist significant numbers of available jobs as a bagger, dishwasher, or packager. (Tr. 49.) When the ALJ asked Thompson to presume light unskilled work, Thompson listed packaging, folding, and food preparation as possible jobs for a person with the noted limitations. (Tr. 49.) When asked finally whether any sedentary jobs were available, Thompson reported that sedentary work would require fine-detail work, which the hypothetical candidate could not perform. (Tr. 49.)

The ALJ issued her decision denying plaintiff's application for benefits on December 9, 2008, and plaintiff exhausted her administrative appeals on April 6, 2009. The instant action followed.

**DISCUSSION**

**I.   Statutory and Regulatory Framework**

      **A.   Standard of Review**

The scope of judicial review under the Social Security Act is limited. We may set aside the Commissioner's determination that a claimant is not entitled to benefits only if the factual findings on which that determination is based "are not supported by substantial evidence" or if the decision "is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks omitted); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). In these circumstances, "substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burgess, 537 F.3d at 127 (internal quotation marks omitted). Because "it is up to the agency, and not th[e] court, to weigh the conflicting evidence in the record," Clark v. Comm'r of Soc. Sec., 143 F.3d 115,

118 (2d Cir. 1998), the Commissioner's decision, if supported by substantial evidence, must be upheld even if substantial evidence would also support the contrary result. See Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").

### B.    Five-Step Analysis

The Social Security Act entitles a person to disability benefits when he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security regulations establish a five-step analysis to determine whether a claimant is eligible for such benefits. See 20 C.F.R. § 416.920(a)(4); see also Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

At the first step, the Commissioner must consider whether the claimant is currently engaged in substantial gainful activity, which is work involving "significant physical or mental activities . . . [done] for pay or profit." 20 C.F.R. §§ 416.920(a)(4)(i), 416.972(a)-(b). A

finding of such activity is a threshold disqualification for benefits. If no such activity is found, the Commissioner next considers whether the claimant has a "severe medically determinable physical or mental impairment," relevantly defined as an impairment that significantly limits the claimant's physical or mental ability to perform basic work activities and is expected to last at least twelve months. See id. §§ 416.920(a)(4)(ii), 416.909.

If the claimant is so impaired, the third step requires the Commissioner to determine, based on the medical evidence, whether the step-two impairment meets or equals any of the impairments listed in 20 C.F.R. § 404, Subpt. P, App. 1 ("Appendix 1"). If so, the claimant is found to be disabled. Id. § 416.920(a)(4)(iii).

If there is no such finding of disability, the Commissioner must proceed to the fourth step to determine whether the claimant is able to perform her "past relevant work," or substantial gainful activity done in the past fifteen years that lasted long enough for the claimant to learn the requirements of the job. Id. §§ 416.920(a)(4)(iv), 416.960(b)(1). This determination requires the Commissioner to assess the claimant's Residual Functional Capacity ("RFC") -- her maximum ability to

perform work "on a regular and continuing basis" despite her physical and mental limitations.[2] Id. § 416.945(a), (b)-(c). In undertaking the RFC analysis, the Commissioner considers "all of the relevant medical and other evidence," including the claimant's daily activities, opinion evidence concerning the claimant's limitations, and subjective symptoms such as pain. Id. §§ 416.912(b), 416.945(a)(3).

If the Commissioner finds that the claimant, given her RFC, is unable to perform her previous work or has no previous work, the fifth and final step requires the Commissioner to determine whether there is other work in the national economy that the claimant is able to perform. See id. § 416.920(a)(4)(v). The Commissioner considers the claimant's limitations as well as vocational factors such as education, age, and work experience. Id. Ordinarily, this determination may be made by resorting to medical vocational guidelines, commonly called "the grids." See Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986); 20 C.F.R. Pt. 404, Subpt. P, App. 2. If, however, the grids do not adequately reflect the claimant's condition because the claimant's nonexertional impairments further restrict her possible work beyond the range reflected in the grids, the

---

[2] Relevant physical capabilities include sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling. 20 C.F.R. § 416.913(c)(1).

Commissioner must consider vocational expert testimony or similar evidence to determine whether jobs exist in the national economy for a person with the claimant's individual limitations. See Bapp, 802 F.2d at 605-06. The claimant is deemed disabled only if she "cannot make an adjustment to other work," 20 C.F.R. § 416.920(a)(4)(v), which "requires more than mere inability to work without pain." Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).

For each of the first four steps, the claimant bears the burden of proof. Petrie v. Astrue, 412 F. App'x 401, 404 (2d Cir. 2011) (citing Rosa, 168 F.3d at 77). If, however, the analysis reaches step five, "the Commissioner then has the burden of proving that the claimant still retains [the RFC] to perform alternative substantial gainful work" available in the national economy. Rosa, 168 F.3d at 77 (internal quotation marks and alteration omitted).

## II.  **The ALJ's Findings**

At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since April 27, 2006, the date on which she filed her application for SSI benefits. (Tr. 27.)

At step two, the ALJ found that plaintiff was not severely impaired by her high cholesterol or acid reflux, but that her visual problems constituted a severe impairment. (Tr. 27.) Proceeding to step three, the ALJ found that plaintiff's visual impairment was neither listed in Appendix 1 nor medically equivalent to any impairment that would automatically qualify her for disability benefits. (Tr. 27-28.)

Before proceeding to step four, the ALJ assessed plaintiff's RFC. Relying principally upon the reports of Dr. Farber, Dr. Mohrman, and Parkview Hospital, the ALJ noted plaintiff's testimony of eye pain and discomfort but found that, while plaintiff's visual impairment could be expected to cause such symptoms, her statements regarding their intensity and limiting effects were not credible. (Tr. 28.) The ALJ also found that plaintiff's subjective complaints of constant pain were unsupported by medical evidence, citing in particular plaintiff's ability to mitigate her pain through medication and Dr. Dykstra's skeptical account of her claims. (Tr. 28-29.) She thus determined that the plaintiff has the RFC to perform "medium work as defined in 20 C.F.R. 416.967(c) [but] requires protection for her right eye" and is precluded

from hazardous activities, namely those involving unprotected heights or dangerous machinery.[3] (Tr. 28.)

Turning to step four, the ALJ found that plaintiff had no past relevant work, as neither plaintiff's month of volunteer work in 2003 nor her two-month employment in 1998 had lasted long enough for her to learn to perform the required work. (Tr. 29, 36-37, 118.) The ALJ then proceeded to the final step and, relying on the testimony of the vocational expert in response to the hypothetical profile posed to him, she determined that a significant number of jobs exist in the national economy that plaintiff is able to perform.[4] (Tr. 29-30.)

## III.    <u>Review of the ALJ's Findings</u>

Plaintiff challenges the ALJ's determination that her visual limitations present the sole impediment to her performance of substantial gainful activity. In particular, plaintiff argues that (1) the ALJ incorrectly determined at step two that plaintiff's non-visual impairments were not severe, and (2) the ALJ failed to fully consider the entire

---

[3] "Medium work" demands lifting no more than fifty pounds at a time with frequent lifting or carrying of objects weighing up to twenty-five pounds. 20 C.F.R § 416.967(c). When a claimant is deemed capable of physical exertion at a "medium" level, she is thereby also deemed to meet the exertional requirements of sedentary and light work. <u>See</u> <u>id.</u>

[4] Specifically, the ALJ relied on the expert's report that in plaintiff's region there are: (1) 1000 bagger jobs; (2) 5000 dishwasher jobs; (3) 5000 "medium work" and 3000 "light work" packager jobs; (4) 500 folder jobs; and (5) 2500 food-preparation jobs. (Tr. 30.)

medical record in assessing plaintiff's RFC.[5] Plaintiff further argues that the ALJ's findings should be reconsidered in light of additional medical evidence produced after the decision. We address each of these concerns below.

## A.   Severity of Impairments

Plaintiff contends that her non-visual ailments, such as lupus, RA, and fibromyalgia, constitute severe impairments overlooked by the ALJ. In particular, plaintiff asserts her eligibility for benefits under Section 14.09 of Appendix 1, which enables claimants with inflammatory arthritis to receive disability benefits. Plaintiff, however, has not demonstrated that the ALJ's finding of plaintiff's visual limitations as her only severe impairment is not supported by substantial evidence.

Section 14.09 requires a claimant to prove: (a) persistent inflammation of one or more major peripheral joints hindering the claimant's ability to ambulate or perform fine and gross movements; (b) persistent

---

[5] Plaintiff also contends that the ALJ incorrectly interpreted the vocational expert's opinion as to the jobs currently available to plaintiff. However, the ALJ's listing of available jobs correctly reiterates Thompson's testimony. (Tr. 30, 49.) While Thompson did state that no jobs existed for sedentary unskilled work with plaintiff's visual limitations, he listed several medium and light work jobs for which plaintiff, with her RFC, has been deemed fit. That plaintiff cannot perform sedentary work is irrelevant so long as she can perform medium or light work because a claimant "need not be able to perform each and every job in a given range of work." Bapp, 802 F.2d at 606 n.1.

inflammation in conjunction with moderate organ impairment or at least two constitutional symptoms (e.g., severe fatigue, fever, malaise, or involuntary weight loss); (c) fixation of the spine; or (d) repeated manifestations of inflammatory arthritis with at least two constitutional symptoms and marked limitation of daily living or social functioning. App. 1, § 14.09. Although plaintiff has repeatedly complained of RA and joint pain, she failed to present the ALJ with any medically obtained diagnosis of an arthritic condition, and the evidence actually indicates the absence of any such condition. (See Tr. 270 (rheumatoid factor test negative), 212 (doctor's notes indicate that RA is questionable)); cf. App. 1, § 14.09(d) (inflammatory arthritis generally diagnosed through clinical features and serologic findings).

Even were a diagnosis of RA to be inferred from the record, plaintiff would fall short of the listed requirements, as she remains able to ambulate and use her upper extremities (Tr. 185 ("walk[s] ok"), 197 (full range of motion)), and she suffers from neither medically determinable constitutional symptoms nor spine fixation. Further, plaintiff's pain alone is insufficient to establish disability, as evidence in the record suggests that her discomfort has been effectively managed by

medication. (Tr. 43 (medication reduces pain by half), 216 (over-the-counter medications generally sufficient to reduce pain)); cf. Dumas, 712 F.2d at 1552 ("To be disabling, pain must be so severe . . . as to preclude *any* substantial gainful employment." (emphasis added)). Her joint pain thus does not constitute a severe impairment.[6]

Plaintiff's other maladies are likewise non-severe. As the ALJ discussed in her decision, plaintiff's high cholesterol and gastrointestinal problems are sufficiently controlled by medication, posing at most a minimal limitation on her ability to perform basic work or social activities. (Tr. 27; see also Tr. 156 ("on Bentyl with marked resolution of symptoms"), 169 (GERD medication), 179 (cholesterol medication).) Similarly, plaintiff's hyperkalemia, vitamin D deficiency, and mild thyroid enlargement are treatable conditions that present negligible constraints on her daily activity. (Tr. 205, 225.) Finally, plaintiff's previous complaints of skin problems, dysphagia, and chest pain were resolved or dismissed as manageable without surgery or ongoing

---

[6] This conclusion applies to plaintiff's various reports of joint pain, regardless of whether the pain derives from fibromyalgia, RA, or another source, as the conditions produce comparable joint discomfort. Compare U.S. Nat'l Library of Med., Rheumatoid Arthritis: MedlinePlus, http://www.nlm.nih.gov/medlineplus/rheumatoidarthritis.html (last updated June 7, 2012), with U.S. Nat'l Library of Med., Fibromyalgia: MedlinePlus, http://www.nlm.nih.gov/medlineplus/fibromyalgia.html (last updated June 1, 2012).

medication (Tr. 197, 312, 214),[7] while her current alleged condition of lupus finds no corroboration in any clinical findings, objective diagnosis, or treatment plan.[8]

We therefore find the ALJ was correct in deeming plaintiff's visual problems the sole severe impairment capable of entitling plaintiff to SSI benefits.

**B.   Consideration of Evidence**

Plaintiff further contends that the ALJ gave insufficient consideration to the entire medical record, neglecting medical and personal reports with regard to the nature and severity of her impairments.

1.   What the ALJ Must Consider

The ALJ must consider "all evidence in [the] case record" when making a disability determination. 20 C.F.R. § 416.920(a)(3). She, however, retains significant discretion in deciding how to weigh the medical evidence and opinions. See id. §§ 416.920b, 416.927(d).

---

[7] Despite plaintiff's assertion that she suffered skin lesions later diagnosed as syringomas, the record shows only recurrent diagnoses of acne, with referrals to dermatological providers that plaintiff does not appear to have acted upon. (Tr. 156, 204, 212.)

[8] While the record does contain test results potentially indicative of lupus, it provides no evidence of any subsequent confirmation, medication, or treatment for the condition. (Tr. 269.) Moreover, though plaintiff correctly notes that pleurisy is often symptomatic of lupus, she has similarly provided no evidence that she ever suffered from a pleuritic condition. (Cf. Tr. 271 (chest scan clear with "[n]o pleural effusions").)

Under the treating physician's rule, for instance, the ALJ must give a treating source's opinion controlling weight only if the ALJ concludes it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. § 416.927(d)(2). Otherwise, when weighing the importance of the source, the ALJ may consider factors such as the examining relationship, the physician's specialization, and evidence presented to support the opinion and its consistency with other evidence. Id. § 416.927(d)(1)-(6); Klett v. Barnhart, 303 F. Supp. 2d 477, 484 (S.D.N.Y. 2004) (citing Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000)). Similarly, while subjective accounts of pain or limitation will be accorded "great weight" when they are supported by objective medical evidence, Simmons v. U.S. R.R. Ret. Bd., 982 F.2d 49, 56 (2d Cir. 1992) (internal quotation marks omitted), when a claimant's symptoms instead suggest a greater severity of impairment than is supported by the medical evidence, the ALJ weighs several evaluative factors to determine whether to credit the claimant's assertions. These factors include the claimant's daily activities, the nature of her symptoms, and any treatments received. See 20 C.F.R. § 416.929(c)(3); see also Morganstein v. Chater, No.

96-6234, 1997 WL 165324, at *2 (2d Cir. Apr. 2, 1997)
(unpublished); Villani v. Barnhart, No. 05-CV-5503 (DRH),
2008 WL 2001879, at *10 (E.D.N.Y. May 8, 2008).

        2.   The ALJ Adequately Weighed the Evidence

The ALJ afforded sufficient consideration to the body
of plaintiff's medical evidence. The ALJ relied principally
on the reports of Dr. Farber,[9] Dr. Mohrman, and Parkview,
which established plaintiff's visual impairment,
gastrointestinal concerns, and history of complaints of
bodily, joint, and chest pain, respectively. (Tr. 161-63,
156-57, 214-30.) No medical report in the lengthy record
substantially contradicts or augments these reports.[10]
Moreover, precisely because the medical reports present
consistent and reiterative findings, the ALJ was not
required to explain her decision to accord significant
weight to these reports but not those of Dr. Kancherla or

---

[9] Contrary to plaintiff's assertions, the ALJ accorded appropriate
weight to Dr. Farber's opinion rather than ignoring his testimony in
favor of that of Dr. Braunlin. The ALJ in fact placed significant
emphasis on Dr. Farber's report of plaintiff's limitations and did not
even mention Dr. Braunlin's assessment, which, in any case, merely
reflected and interpreted Dr. Farber's findings. (Tr. 27-29, 184-86,
161-63.)

[10] In particular, Dr. Braunlin's opthalmological diagnosis and Dr.
Kancherla's gastrointestinal diagnosis echo those of Dr. Farber and Dr.
Mohrman, respectively, while plaintiff's complaints and treatment at
Matthew 25 essentially mirror those at Parkview. The few complaints or
medical findings that appear only once in the record before the ALJ --
namely, plaintiff's complaint of discolored ankles, ambiguous lupus
testing, and official diagnosis of GERD -- present no medical issue
potentially meaningful enough to bear on the ALJ's decision, and
therefore warrant no discussion.

Matthew 25.[11] See Zabala v. Astrue, 595 F.3d 402, 409-10 (2d Cir. 2010) (remand unnecessary where unconsidered evidence was essentially duplicative and would produce same decision upon reconsideration). Nevertheless, it is worth emphasizing that the ALJ's stated reason for prioritizing the former three -- namely, their consistency across providers -- applies equally to all five sources. The ALJ's findings thus fully incorporate the sum of the medical evidence on record.

The ALJ also appropriately considered plaintiff's subjective claims. The persistence with which plaintiff has returned to doctors to complain of aches and ailments is not alone sufficient to establish their existence or their impact on her ability to work. See 20 C.F.R. § 416.929(c)(4); Dumas, 712 F.2d at 1552-53. As the ALJ observed, plaintiff's claims of pain and limited functioning were unsubstantiated by any objective medical evidence, and were at times internally inconsistent. Cf. Dumas, 712 F.2d at 1553 (the Commissioner "is entitled to

---

[11] The ALJ's decision not to accord significant weight to the reports of Dr. Braunlin, Fort Wayne Eye Associates, Boriken Neighborhood Health Center, Lutheran, or the state agency physicians also requires no explanation, as the reports of physicians without an ongoing relationship with the patient carry less weight than those of a treating physician. See Mongeur v. Heckler, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983).

rely not only on what the record says, but also on what it does not say").

For instance, despite repeatedly asserting constant, extreme, and ubiquitous pain, plaintiff admitted that medications substantially mitigated her discomfort, and she was routinely dismissed by doctors as appearing well, comfortable, and even jocular. (Tr. 197, 214, 223.) Similarly, plaintiff's account of watching four hours of television a day (Tr. 45) belies her assertions that she cannot sit for any period of time, use a computer screen, or be exposed to bright light (Tr. 46, 40, 47), while her ability to go grocery shopping (Tr. 46) casts doubt on her purported inability to stand for more than ten minutes or walk for a block. (Tr. 46.) The vague and generalized nature of plaintiff's pain, which she has been unable to specifically describe or locate, also calls into question the severity of her symptoms and the likelihood of their impeding her future employment, as does the consistently conservative and limited nature of their treatment. Cf. Burgess, 537 F.3d at 129 (taking only over-the-counter medicine in conjunction with negative test results or opinions supports denial of benefits). Moreover, as noted by the ALJ, the credibility of plaintiff's claims is undermined by plaintiff's own admission that the primary

reasons for her continued unemployment are not medical but preferential -- namely, her stated lack of tolerance for others and unwillingness to follow orders. (Tr. 34.)

The ALJ thus was not required to make allowances for plaintiff's debatable bodily pains when formulating her RFC. Rather, the ALJ's conclusion that plaintiff is fit for medium work, subject to visual limitations, is substantially supported by and inclusive of the evidence on record, which portrays plaintiff as a visually impaired woman with manageable gastrointestinal and joint pain. The hypothetical profile incorporating visual limitations posed by the ALJ to the vocational expert therefore appropriately "reflect[ed] the full extent of the claimant's capabilities and impairments," Sanchez v. Barnhart, 329 F. Supp. 2d 445, 449 (S.D.N.Y. 2004), and the ALJ's step-five determination of the jobs available for a person capable of medium work with such limitations is affirmed.

### C.   Additional Evidence

We address, lastly, the distinct question of whether evidence produced after the ALJ's decision supports a remand. A court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to

incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). A plaintiff must consequently show that any evidence proffered after a decision has been rendered is relevant to her condition during the period at issue, probative such that there is a reasonable possibility that it would have influenced the Commissioner to decide her application differently, and not merely cumulative of what is already in the record. See Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988); see also Lisa v. Sec'y of Dep't of Health and Human Servs., 940 F.2d 40, 43-45 (2d Cir. 1991).

Plaintiff has produced a medical order from January 2009 that purports to offer a diagnosis of fibromyalgia otherwise absent from the record. This order, however, is insufficient to warrant reconsideration of either plaintiff's step-two impairments or her RFC. As no objective tests can verify the existence of fibromyalgia, a diagnosis of the condition requires ongoing evaluation and monitoring of the patient's symptoms.[12] By contrast, this order represents an isolated document unsupported by medical observations or findings, created not as a final record of plaintiff's diagnoses but rather as a predicate

---

[12] See Nat'l Fibromyalgia Ass'n, Diagnosis, http://fmaware.org/site/PageServerda3b.html?pagename=fibromyalgia_diagnosed (last visited June 20, 2012) (noting that fibromyalgia takes on average five years of testing to be accurately diagnosed).

to urinalysis ordered in association with plaintiff's GERD. It is therefore insufficient to support a diagnosis of fibromyalgia. See 20 C.F.R. § 416.927(d)(2) (evidence is to be given controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques"). Moreover, plaintiff's general accounts of joint pain, as well as her history of taking mild painkillers for the condition, were fully considered by the ALJ in determining plaintiff's RFC. At most, this order thus offers purely cumulative evidence, as it merely applies "specific medical terminology" to symptoms that had been alleged and observed for years. Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983). Further, as noted above, a diagnosis of fibromyalgia is insufficient to constitute a severe impairment under Section 14.09 without additional symptoms not demonstrated here.

Plaintiff's evidence is therefore not sufficient to warrant a remand.

## CONCLUSION

For the reasons set forth above, the Commissioner's motion (docket no. 16) is granted, and the decision denying plaintiff SSI benefits is hereby affirmed.

**SO ORDERED.**

Dated:     New York, New York
           June 20, 2012

                                    _____
                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE

Copies of the foregoing Order have been mailed on this date
to the following:

**Plaintiff:**
Emily Ortiz
1980 Lexington Avenue, Apt 10-K
New York, NY 10035

**Attorney for Defendant:**
Susan D. Baird
United States Attorney Office
86 Chambers Street, 3rd Floor
New York, NY 10007